UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHENITA R. HALL,                    }
                                    }
        Plaintiff,                  }
                                    }
v.                                  }          CASE NO. 2:04-CV-0202-RDP
                                    }
STERNE, AGEE & LEACH GROUP,         }
INC.,                               }
                                    }
        Defendant.                  }

## MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment (Doc. # 16) and

Defendant's Motion to Strike (Doc. # 23).  The above-referenced motions have been fully briefed

and were under submission as of April 15, 2005.  (Docs. # 9, 19).

Plaintiff Shenita R. Hall, an African-American employee in the Accounting Department at

Sterne, Agee & Leach ("Sterne"), claims that she was denied a promotion because of her race in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., as amended.

(Complaint).[1]  For the reasons outlined below, Defendant's Motion for Summary Judgment is due

to be granted because there are no disputed issues of material fact and Defendant has demonstrated

that it is entitled to judgment as a matter of law. Defendant's Motion to Strike will be denied.[2]

---

[1] Although the introductory paragraph of Plaintiff's complaint mentions claims for breach of contract, negligence, and Section 1981, Plaintiff's only identified count is "Count I:  Violation of 42 U.S.C. § 2000(e) Title VII."  (*See* Complaint, at 4, and Hall Depo., at 39).  Moreover, Plaintiff's brief in opposition to summary judgment admits that she only asserts a claim for employment discrimination based on race pursuant to Title VII. (Doc. # 21, at 7).

[2] The court has reviewed Defendant's motion to strike and will assume, without deciding, for the purposes of summary judgment only, that it is due to be denied and that the evidence sought to be stricken is properly considered by the court in its summary judgment analysis.  As the court is

## I.    Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-08 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[3]

---

granting summary judgment in favor of the Defendant, it finds that, even considering the evidence sought to be stricken, Plaintiff has not met her burden to refute the Defendant's motion for summary judgment.

[3] Here, it is undisputed that Plaintiff has presented only circumstantial evidence of discrimination.

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of establishing a *prima facie* case of discrimination. Second, once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 801-02; *Burdine*, 450 U.S. at 251-54.

## II.     Relevant Undisputed Facts[4]

Founded in 1901, Sterne provides investors with high-quality investment opportunities. (Woodham Declaration, ¶ 1). Headquartered in Birmingham, Alabama, Sterne is a member of the New York Stock Exchange and a registered broker/dealer, offering clients the advantages of a full-service firm. (Woodham Declaration, ¶ 2). The company's expertise includes retail and institutional brokerage, investment banking and underwriting, secondary trading of corporate, municipal, and government securities, and market making in over-the-counter stocks. (Woodham Declaration, ¶ 2). Sterne has offices located in thirteen states including Alabama. (Woodham Declaration, ¶ 1).

In May 1998, Plaintiff began working at Sterne as a Junior Accounting Associate in the Birmingham location. (Hall Depo., at 24; Doc. # 18, Ex. 6, at 3). Prior to joining Sterne, Plaintiff

---

[4] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

obtained her bachelor's degree in Accounting from Birmingham-Southern College and worked for thirteen years at AmSouth Bank as an Accounts Payable Clerk and at Pro Staff Temporary Services as a General Ledger Clerk.  (Hall Depo., at 12-13, 55; Doc. # 18, Ex. 6, at 2).

A.     **Reorganization of the Accounting Department and Creation of the Accounting Supervisor Position**

During the time period relevant to Plaintiff's claims, Timothy Speegle was the Senior Vice President Controller in charge of managing the Accounting Department in Birmingham.  (Speegle Declaration, ¶ 1-2).  Speegle had eight members of the accounting staff reporting directly to him, including Plaintiff and Leanne Bishop. (Speegle Declaration, ¶ 3; Doc. # 18, Exs. 8, 9).

Beginning in December 2002, Speegle and Fred Wagstaff, the company's Chief Financial Officer, began to discuss reorganizing the Accounting Department to increase efficiency, reduce duplication, and free more time for performance of Speegle's duties.  (Speegle Declaration, ¶ 4).  The reorganization was not implemented until May 2003, due in part to Speegle's desire to evaluate the Accounting Department's personnel over time to form a reasoned opinion concerning their strengths, weaknesses, and overall fitness for supervisory positions within the Accounting Department.  (Speegle Declaration, ¶ 4).

As part of the reorganization, an Accounting Supervisor position was created which entailed the following responsibilities:  1)  review and balance non-system generated revenue;  2)  supervise posting of insurance and mutual fund revenue to broker commissions;  3)  supervise, review and balance TEFRA withholdings;  4) prepare and submit TEFRA reporting;  5)  supervise and review reconciliation and clearance of reconciling items of general ledger accounts assigned to staff, and 6)  assist and manage special projects as required.  (Doc. # 18, at Ex. 12).  Wagstaff and Speegle

looked for certain characteristics in the Accounting Department personnel to determine who should fill the position of Accounting Supervisor once the department was reorganized, keeping in mind that their goal was to reduce the amount of time that Speegle spent with direct reports and supervising others. (Speegle Declaration, ¶ 6). The optimum job qualifications for the position included the following: 1) bachelor's degree in Finance or Accounting, CPA or CPA candidate preferred; 2) excellent organizational skills as well as strong interpersonal and communication skills; 3) strong computer skills including excellent knowledge of Excel; 4) strong work ethic with ability to work some evenings and weekends when required to meet deadlines; 5) ability to manage and develop staff and accounting systems; 6) excellent working knowledge of generally accepted accounting policies and procedures; and 7) thorough analytical and problem-solving skills. (Doc. # 18, at Ex. 12).

The position was not posted, although Accounting Department vacancies are not normally posted because it is Sterne's policy to consider all qualified employees when filling vacancies. (Hall Depo. at 49; Doc. # 18, Ex. 10). Seniority, alone, is not determinative of promotions at Sterne. (Speegle Declaration, ¶ 8). Sterne has a policy of not discriminating on the basis of race, and a written notice regarding Equal Employment Opportunity is posted in all of Sterne's offices. (Doc. # 18, Ex. 10).

In anticipation of promotional opportunities, Plaintiff emailed Speegle on September 18, 2002, eight months before the Accounting Supervisor position was filled in May 2003:

> In the last four years, as a Jr. Accountant, I have learned a lot working at Sterne, Agee & Leach. I have seen the department grow and strive for Perfection. Especially, with the monthly meetings held by Declan O'Beirne.

> With my experience, knowledge, and education, I would like an opportunity to grow more with the company. There is always room for growth and opportunities in the Accounting department when working as a team. With a lot of changes made in the department, I would like the opportunity of learning more for advancement as an Accountant.

(Hall Depo., at 32, 87; Doc. # 18, Ex. 11).  Speegle never replied to Plaintiff's e-mail. (Hall Depo., at 32.).[5]

### B.    Relative Qualifications of Plaintiff and Leanne Bishop for the Position

Sterne considered both Plaintiff and the successful candidate, Leanne Bishop, for a promotion to Accounting Supervisor. (Speegle Declaration, ¶ 7). Bishop was hired by Sterne on June 11, 2002, as an Accountant, and she has a bachelor's degree in Finance and Accounting from Birmingham-Southern College in Birmingham, AL. (Doc. # 18, Ex. 7, at 1, 3). Prior to joining Sterne, Bishop worked as a Financial Management Trainee at Southtrust Bank. (Doc. # 18, Ex. 7, at 2). At the time that Sterne was considering candidates for the Accounting Supervisor position, Plaintiff had worked for Sterne for over four years while Bishop had been with Sterne for only one year. (Doc. # 21, at Exs. 3, 4; Hall Depo., at 24).

In making the promotion decision, Speegle and Wagstaff weighed the work product, work ethic, and overall understanding of the goals of the department exhibited by both candidates. (Speegle Declaration, ¶ 7).[6] Based upon their observations, Speegle and Wagstaff viewed Bishop

---

[5] Plaintiff claims that she emailed Speegle to inquire specifically about the Accounting Supervisor position. Speegle maintains that Plaintiff's September 2002 email could not have inquired about the Accounting Supervisor position because it was not even open for consideration until May 2003. (Speegle Declaration, ¶ 4). Regardless, this dispute is not material because there is no dispute that Plaintiff was considered for the position when it was filled in May 2003.

[6] Although Plaintiff disputes this fact, she does so only with a general reference to her declaration. Nothing in Plaintiff's declaration disputes Speegle's testimony, and in any event, Plaintiff has no personal knowledge of Speegle and Wagstaff's decisional process.

as more qualified than Plaintiff based upon a number of factors other than tenure with the company. (Speegle Declaration, ¶ 8).[7]   For example, they considered each individual's ambition and assertiveness in mastering the accounting system, recognizing the needs of the department, and general problem-solving, as well as each individual's overall desire for efficiency and knowledge about the business.  (Speegle Declaration, ¶ 9).[8]

### 1.   Mastery of Bank Reconciliations

It is undisputed that Plaintiff had knowledge of bank reconciliations. (Hall Declaration, at 2).   However, Speegle thought that Plaintiff exhibited difficulty with even simple bank reconciliations.  (Speegle Declaration, ¶ 10).  In Speegle's opinion, Plaintiff often failed to identify errors generated or suggest solutions for resolution of the problem.  (Speegle Declaration, ¶ 10). Speegle also observed that if someone else identified a problem for Plaintiff, such as particular ledger imbalances, she often would not follow up to determine if the error was corrected.  (Speegle Declaration, ¶ 10).  Plaintiff disagrees with Speegle's estimation of her.  In Plaintiff's opinion, she did not have difficulty reconciling bank statements.  (Hall Declaration, at 2).  Plaintiff maintains that if she discovered a reconciliation error that was not corrected, she would point out the error to the accounts payable supervisor. (Hall Declaration, at 2).

---

[7] Although Plaintiff disputes this fact, she does so only with a general reference to her declaration. Nothing in Plaintiff's declaration disputes Speegle's testimony, and in any event, Plaintiff has no personal knowledge of Speegle and Wagstaff's decisional process.

[8] Although Plaintiff disputes this fact, she does so only with a general reference to her declaration. Nothing in Plaintiff's declaration disputes Speegle's testimony, and in any event, Plaintiff has no personal knowledge of Speegle and Wagstaff's decisional process.

### 2.      Enthusiasm and Desire to Improve

Additional factors that Speegle and Wagstaff considered important were the candidates' enthusiasm and desire to improve.  (Speegle Declaration, ¶ 11).[9]  Although Plaintiff occasionally worked on weekends, she would only "stay late if my workload required me to do so." (Hall Declaration, at 3).  Speegle noticed that Plaintiff did not work weekends unless directly asked to do so, and he felt that she was not inquisitive concerning the business function, roles, and efforts to increase efficiency.  (Speegle Declaration, ¶ 11).

On the other hand, Bishop frequently worked on the weekends, even though she was not required to work.  (Speegle Declaration, ¶ 14).[10]  Bishop displayed a very strong work ethic and desire to learn and lead.  (Speegle Declaration, ¶ 14).[11]  Also, according to Speegle, Bishop had a strong sense of what needed to be accomplished, both on a daily basis and over time, to achieve the

---

[9] Although Plaintiff disputes this fact, she does so only with a general reference to her declaration. Nothing in Plaintiff's declaration disputes Speegle's testimony, and in any event, Plaintiff has no personal knowledge of Speegle and Wagstaff's decisional process.  Moreover, although Plaintiff claims that her "desire to improve" is evidenced by her attendance at the New Horizon Learning Center to study Microsoft Access and take a time management class, she admits that her attendance occurred in October 2004, over a year *after* the Accounting Supervisor position was filled in May 2003. (Hall Declaration, at 3).

[10]  Although Plaintiff disputes this fact, she does so only with a general reference to her declaration. Nothing in Plaintiff's declaration disputes Speegle's testimony about Bishop's qualifications, and in any event, Plaintiff has not professed to have any personal knowledge about Bishop's work habits.

[11]  Although Plaintiff disputes this fact, she does so only with a general reference to her declaration. Nothing in Plaintiff's declaration disputes Speegle's testimony about Bishop's qualifications, and in any event, Plaintiff has not professed to have any personal knowledge about Bishop's qualifications.

Accounting Department's goals.  (Speegle Declaration, ¶ 14).[12]  Bishop often took the initiative to resolve problems and to follow up with solutions to determine if the best course of action was pursued.  (Speegle Declaration, ¶ 14).[13]  Speegle was impressed with Bishop's thirst for general knowledge about the company and the industry, her existing and growing knowledge of Sterne's accounting system, her ability to timely get brokers their money, and her ability to contain fluctuation and timing issues that had plagued the department in the past.  (Speegle Declaration, ¶ 14).[14]

To Speegle's knowledge, Plaintiff did not make efforts to study and take the certified public accounting licensing exam ("CPA exam") to improve her credentials, while Bishop did.  (Speegle Declaration, ¶ 11-12).[15]  According to Speegle, a CPA license demonstrates that one has a

---

[12]  Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Speegle's testimony about Bishop's qualifications, and in any event, Plaintiff has not professed to have any personal knowledge about Bishop's qualifications.

[13]  Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Speegle's testimony about Bishop's qualifications, and in any event, Plaintiff has not professed to have any personal knowledge about Bishop's qualifications.

[14]  Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Speegle's testimony about Bishop's qualifications, and in any event, Plaintiff has not professed to have any personal knowledge about Speegle's opinion of Bishop.

[15] Although Plaintiff disputes this information by claiming, in her post-deposition affidavit, that she did study for the CPA exam during the time of her employment at Sterne (Hall Declaration, at 3), Plaintiff failed to reveal this information during her deposition, even when directly asked about it:

Q:  Do you know if anybody is currently studying for the CPA exam?
A:  Yes.
Q:  Who is?
A:  Well, Leanne [Bishop] is studying for her CPA.  And before Jason left he was studying for his CPA.  And that's all that I know right offhand.

fundamental grasp of the principles and theories of accounting that are necessary for effective growth and maintenance of an accounting department. (Speegle Declaration, ¶ 12; Hall Depo., at 88). In other words, it is a benchmark for the level of knowledge for an accountant, and is a preferred qualification for promotion to the Accounting Supervisor position. (Speegle Declaration, ¶ 12). Speegle did not think that Plaintiff, even with training, understood the essence of the company's business goals and the Accounting Department's role in realizing the company's goals. (Speegle Declaration, ¶ 13).[16]

### 3.   Proficiency in Microsoft Access and Excel

Finally, Speegle and Wagstaff were not impressed with Plaintiff's mastery of Microsoft Access ("Access"), the company's specially-designed software used to capture information and streamline the accounting functions within the office. (Speegle Declaration, ¶ 11). Access is a database management system which uses structured query language to manipulate data. (Hutto Declaration, ¶ 4).[17]   Access allows for tailored developing and modifying of code, which enables

---

(Hall Depo., at 88). Plaintiff "cannot [now] . . . create . . . an issue [of fact] with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Moreover, Plaintiff has not presented any evidence to show that Speegle *was aware* of her efforts to study for the CPA exam before he made the decision to promote Bishop to Accounting Supervisor, nor has Plaintiff produced any evidence showing CPA class registration, exam results, etc.

[16]   Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Speegle's testimony, and in any event, Plaintiff has no personal knowledge of Speegle's opinion of her.

[17]   Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Defendant's explanation of Access, except Plaintiff's generic statement that "Access is not used for reconciliations, this is done manually." (Hall Declaration, at 3).  It is undisputed that *prior to* the creation and implementation of an Access cash disbursement reconciliation process, reconciliations were done manually. (Hutto Declaration, ¶ 7).  However, once Sterne developed an Access system for reconciliations, it replaced the manual

various databases and accounting reports to be created, quickly added, or modified.  (Hutto Declaration, ¶ 4).[18]  Thus, Access can be adopted to suit a company's individual database requirements;  in short, the net goal of Access usage is to streamline business accounting processes and to manage and query large amounts of data.  (Hutto Declaration, ¶ 4).[19]  Training in Access and Excel is particularly important because Sterne's primary broker uses a trading and clearing system known as BETAACCESS, which allows the transfer of accounting and trading data to Access via linked tables or data imports to Excel. (Hutto Declaration, ¶ 4). [20]

Gary Hutto, an independent management consultant certified in public accounting who works with Sterne on its various Access databases, worked with Plaintiff on many occasions, including training her on new systems, and was able to observe her aptitude for learning and operating Sterne's database systems and troubleshooting errors.  (Hutto Declaration, ¶¶ 1, 3, 5, 6).[21]  Hutto trained a

---

system for reconciliations, and Plaintiff was trained on the new system. (Hutto Declaration, ¶ 7).

[18]   Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Defendant's explanation of Access, except Plaintiff's generic statement that "Access is not used for reconciliations, this is done manually." (Hall Declaration, at 3).  *See* discussion in footnote 17 *supra*.

[19]   Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Defendant's explanation of Access, except Plaintiff's generic statement that "Access is not used for reconciliations, this is done manually." (Hall Declaration, at 3). *See* discussion in footnote 17 *supra.*

[20]   Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.  Nothing in Plaintiff's declaration disputes Defendant's explanation of Access, except Plaintiff's generic statement that "Access is not used for reconciliations, this is done manually." (Hall Declaration, at 3).  *See* discussion in footnote 17 *supra.*

[21]  Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's observations of Plaintiff. It is undisputed that Hutto has worked with Sterne intermittently since May 2001 to improve its accounting procedures and functions, as well as to achieve its overall business

number of Accounting Department personnel, including Bishop and Plaintiff, in Access and Microsoft Excel. (Hutto Declaration, ¶ 5). Although Hutto regards Plaintiff as a pleasant person, Hutto found that she had weak computer skills and possessed a limited understanding of both Excel and Access, despite several training sessions provided by Hutto directly. (Hutto Declaration, ¶ 5).[22] Although Hutto thought that Plaintiff was able to perform tasks that were explicitly given to her in detail, he also thought that she displayed a lack of those problem-solving abilities necessary to troubleshoot and correct accounting problems. (Hutto Declaration, ¶ 8).[23] Hutto's opinion of Plaintiff's limited computer skills, lack of troubleshooting ability, and failure to correct various errors was given to Speegle on several occasions. (Hutto Declaration, ¶ 9).[24]

Prior to Hutto's development of an Access cash disbursement reconciliation process, Plaintiff prepared cash disbursement reconciliations manually using reports provided to her by Sterne's

---

goals through effective management of accounting data and implementation of various systems. (Hutto Declaration, ¶ 3). Although Plaintiff points to a July 31, 2003 email (two months after the Accounting Supervisor position decision was made) as evidence "that she was only provided Access on July 31, 2003," (Hall Declaration, at 3), all that the email shows is that Plaintiff requested installation of Access on her personal computer in July 2003. The testimony is undisputed that many months prior to the promotion decision in May 2003, Sterne had numerous opportunities to observe Plaintiff's proficiency with the system while she was trained by Hutto on Access. (Hutto Declaration, ¶ 7).

[22] Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's observations of Plaintiff. *See* discussion in footnote 21 *supra*.

[23] Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's observations of Plaintiff. *See* discussion in footnote 21 *supra*.

[24] Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's observations of Plaintiff or the fact that Hutto told Speegle his opinion of Plaintiff's skills. *See* footnote 21 *supra*.

operations department and Sterne's bank.  (Hutto Declaration, ¶ 7).[25]   Hutto helped Plaintiff reconcile the cash disbursement account on numerous occasions because of the difficulty she encountered, despite several training sessions, in performing the task.  (Hutto Declaration, ¶ 7).[26] In fact, at the end of Sterne's fiscal year in September 2003, Plaintiff had not kept the cash disbursement reconciliations current and Sterne instructed Hutto to step in and "catch-up" the reconciliations.  (Hutto Declaration, ¶ 7).[27] Hutto found that although Plaintiff had the ability to recognize errors in her reconciliations, she failed to "follow-up" and correct these errors, which is required to determine the nature of the reconciling items, their causes, and their effects on Sterne's accounting records.  (Hutto Declaration, ¶ 8).[28]

---

[25]  Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's role as a consultant to Sterne.  Moreover, Plaintiff essentially admits that reconciliations were manually performed at some point when she states that  "Access is not used for reconciliations, this is done manually."  (Hall Declaration, at 3).

[26]  Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's role as a consultant to Sterne or Hutto's involvement in Plaintiff's reconciliations.  In Plaintiff's opinion, she did not have difficulties with reconciling bank statements.  (Hall Declaration, at 2).

[27]  Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's role as a consultant to Sterne or Hutto's involvement in Plaintiff's reconciliations.  In Plaintiff's opinion, she did not have difficulties with reconciling bank statements.  (Hall Declaration, at 2).

[28]  Although Plaintiff disputes this fact with a general reference to her declaration, Plaintiff's declaration does not even mention Hutto, much less offer any evidence to dispute Hutto's observations of Plaintiff. In Plaintiff's opinion, she did not have difficulties with reconciling bank statements.  (Hall Declaration, at 2).

Based upon the relative skills, knowledge, and abilities of Plaintiff and Bishop, Wagstaff and Speegle promoted Bishop to Accounting Supervisor in May 2003. (Speegle Declaration, ¶ 15).[29]

### C.    Plaintiff's Claims in This Case

Plaintiff filed her charge of discrimination on June 27, 2003, and was issued a dismissal and notice of rights to sue on November 5, 2003. (Doc. # 21, at Ex. 9; Doc. # 18, Ex. 13).   Plaintiff's judicial complaint was filed on February 2, 2004 "to redress a pattern of employment discrimination based on race" under Title VII. (Complaint, Intro). The only claim asserted by Plaintiff in this lawsuit is one for discrimination based on her race arising out of her failure to be promoted to the Accounting Supervisor in May 2003. (Complaint, ¶¶ 2, 3).[30]

## III.    Applicable Substantive Law and Discussion

In order to establish a *prima facie* case of disparate treatment in promotions based on race, Plaintiff must show: (1) she is a member of a protected class; (2) she suffered an adverse job action; (3) her employer treated similarly-situated employees outside her classification more favorably; and (4) she was qualified to do the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973);

---

[29] Although Plaintiff disputes this fact, she does so only with a general reference to her declaration.   Nothing in Plaintiff's declaration disputes Speegle's testimony about Bishop's qualifications, and in any event, Plaintiff has not professed to have any personal knowledge about Bishop's qualifications or Speegle's decisional process.

[30] Although Plaintiff's affidavit also states, "[d]uring the pendency of this case, I applied for a Senior Accounting Manager position in November 2004 and was passed-over for this position by Debra Honea, who has a high school diploma and far less work experience" (Hall Declaration, at 2), Plaintiff does not claim this promotion as a basis for relief in this case.  Plaintiff never amended her February 2004 complaint to include this claim and the deadline for amending the pleadings expired in May 2004, six months *before* Plaintiff allegedly was passed over for the November 2004 Senior Accounting Manager position.  Moreover, Plaintiff's brief in opposition to summary judgment does not argue or even mention this position as a separate claim, nor does Plaintiff rely on Debra Honea as a comparator or in support of her pretext argument.  Accordingly, the court will not consider the November 2004 promotion decision as a separate "claim."

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995).

Plaintiff argues that, because of her race, she was not promoted to the Accounting Supervisor position in May 2003.  Defendant argues that Plaintiff has failed to make out a *prima facie* case because she has not demonstrated that similarly situated white employees were treated more favorably. The court will assume that Plaintiff has established a *prima facie* case of discrimination related to the promotion decision at issue, *see Walker v. Mortham*, 158 F.3d 1177, 1187-93 (11th Cir 1998) (holding that when an employer relies upon the incumbent's qualifications as its reason for promotion, a comparison of Plaintiff's and incumbent's qualifications is considered at the pretext stage, not during analysis of the *prima facie* case), and focus on the parties' respective arguments regarding whether Sterne has articulated legitimate, non-discriminatory reasons for the selection of Bishop for the position and whether Plaintiff is able to present substantial evidence showing such reasons are pretextual.

### A.    Defendant's Articulated Reasons

Defendant's overarching reason for selecting Bishop for the Accounting Supervisor is that Defendant believed Bishop to be more qualified for the position than Plaintiff.  Specifically, Speegle and Wagstaff weighed the work product, work ethic, and overall understanding of the goals of the department exhibited by both candidates.  (Speegle Declaration, ¶ 7).  They considered each individual's ambition and assertiveness in mastering the accounting system, recognizing the needs of the department, and general problem-solving, as well as each individual's overall desire for efficiency and knowledge about the business.  (Speegle Declaration, ¶ 9).  Based upon their observations, Speegle and Wagstaff viewed Bishop as more qualified than Plaintiff.  (Speegle

Declaration, ¶ 8).  The court finds that Defendant has met its "exceedingly light" burden to articulate a nondiscriminatory reason for the adverse action. *Walker v. NationsBank*, 53 F.3d 1548, 1556 (11th Cir.1995).

### B.    Plaintiff's Evidence of Pretext

Plaintiff disagrees with Sterne's assessment of her qualifications; in Plaintiff's eyes she was more qualified for the position than Bishop.  (Hall Declaration).  Plaintiff essentially asks the court to engage in a *pro hac* comparison of the relative qualifications of the two candidates despite clear Eleventh Circuit law frowning upon such comparisons because they confuse honest but different evaluations of qualifications with intentional discrimination. *See e.g., Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1253-54 (11th Cir. 2000).  "[F]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'"  *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc).  Disparities in qualifications are not evidence of discriminatory intent unless they "are so apparent as virtually to jump off the page and slap you in the face."  *Lee,* 226 F.3d at 1253-54.

In spite of *Plaintiff's* very high opinion of her qualifications, the evidence shows that *the decision-maker's* opinion of the relative qualifications was not unfounded and that this is not a "slap you in the face" case.  Sterne points to several qualities that it found Plaintiff lacked for the Accounting Supervisor position: (1) mastery of bank reconciliations; (2) proficiency in Microsoft Access; and (3) enthusiasm and desire to improve.   Plaintiff fails to show that any of these reasons were a pretext for race discrimination.

### 1.     Bank Reconciliations

First, Speegle found that Plaintiff had difficulty processing simple bank reconciliations, often failing to identify errors generated or follow-up with solutions for resolution of the problem. (Speegle Declaration, ¶ 10). Plaintiff disputes Speegle's estimation of her reconciliation abilities because, in her opinion, she was proficient with bank statements. (Hall Declaration, at 2). In an attempt to demonstrate pretext, Plaintiff points to a May 2003 email she sent to Taunya Grant asking for daily reports "so I can solve some of my problems when I am out of balance." (Doc. # 21, at 6). This May 2003 email – apparently sent in the same month that the Accounting Supervisor decision was made – does not dispute Sterne's pre-decision assessment of Plaintiff's reconciliation abilities. If anything, Plaintiff admits in the email that she *does have* problems balancing her statements. Moreover, Plaintiff's current responsibility to train two individuals who process reconciliations (*see* Hall Declaration, at 3), does not demonstrate pretext, as she claims. (Doc. # 21, at 9). Nor does the fact that Plaintiff is *currently* involved in training employees who work with bank statements affect Sterne's assessment of her reconciliation abilities before the May 2003 decision to promote Bishop.

Moreover, the mere fact that Plaintiff disagrees with Sterne's opinion about her reconciliation abilities does not get her past summary judgment – the Eleventh Circuit has made clear that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman*, 229 F.3d at 1034 (citations omitted). In this case, Sterne has clearly articulated facts that led to Speegle's assessment of Plaintiff. It is undisputed that Hutto, Sterne's independent consultant, had to intervene on numerous occasions to help Plaintiff reconcile the cash disbursement account. (Hutto Declaration, ¶ 7). In fact, because Plaintiff had not kept the cash disbursement reconciliations

17

current, Hutto had to step in at the end of Sterne's 2003 fiscal year and "catch-up" the reconciliations.  (Hutto Declaration, ¶ 7).  The undisputed evidence indicates that Sterne was concerned about Plaintiff's failure to "follow-up" and correct errors, a skill necessary to determine the nature of the reconciling items, their causes, and their effects on Sterne's accounting records.  (Hutto Declaration, ¶ 8).  Plaintiff has not demonstrated pretext with respect to Sterne's opinion of her reconciliation abilities.

### 2.      Computer Proficiency in Access

It is also undisputed that Plaintiff had difficulty mastering Access, a system that Sterne considered "particularly important" to its business.  (Hutto Declaration, ¶ 4).  Hutto again had the opportunity to observe Plaintiff during training sessions and found that she had weak computer skills and possessed a limited understanding of both Excel and Access.  (Hutto Declaration, ¶ 5).  Hutto thought that Plaintiff lacked troubleshooting ability and he communicated that concern, as well as others, to Speegle on several occasions.  (Hutto Declaration, ¶ 9).

Plaintiff argues that the fact that Access was not installed on her personal computer until after the May 2003 promotion decision demonstrates pretext.  (Doc. # 21, at 9).  As noted earlier, the testimony is undisputed that many months prior to the actual installation of Access on her computer, Sterne had numerous opportunities to observe Plaintiff's proficiency with the system while she was trained by Hutto on Access.   (Hutto Declaration, ¶ 7).   Nor does Plaintiff's argument that "Access is not used for reconciliations, this is done manually" (Hall Declaration, at 3), demonstrate pretext.  It is undisputed that *prior to* the creation and implementation of an Access cash disbursement reconciliation process, reconciliations were done manually. (Hutto Declaration, ¶ 7).  However, once Hutto developed an Access system for reconciliations, it replaced the manual system for

reconciliations, and Hutto trained Plaintiff on the new system. (Hutto Declaration, ¶ 7). Plaintiff has not demonstrated pretext with respect to Sterne's view that she had less proficient computer skills than Bishop.

### 3.      Enthusiasm and Desire to Improve

Finally, Bishop's work habits and "thirst for knowledge" impressed Sterne.  Although Plaintiff occasionally worked on weekends, she would only "stay late if [her] workload required [her] to do so."  (Hall Declaration, at 3).  In contrast, Bishop frequently worked on the weekends, even when she was not required to work.  (Speegle Declaration, ¶ 14).  Bishop displayed a very strong work ethic and desire to learn and lead.  (Speegle Declaration, ¶ 14).  She took the initiative to resolve problems and to follow up with solutions to determine if the best course of action was pursued.  (Speegle Declaration, ¶ 14).

Bishop also took the CPA exam, which impressed Speegle because it was a preferred qualification for promotion to the Accounting Supervisor position.  (Speegle Declaration, ¶ 12). As noted earlier, to Speegle's knowledge, Plaintiff did not make efforts to study and take the CPA exam. (Speegle Declaration, ¶ 11-12).  Although Plaintiff's post-deposition affidavit now claims that she did, in fact, study for the CPA exam while employed at Sterne (Hall Declaration, at 3), even if that affidavit testimony did not run afoul of the rule in *Van T. Junkins*,[31] there is no evidence that Speegle was aware of Plaintiff's studies.  Regardless, Plaintiff's CPA efforts are not enough to "slap you in the face" that Plaintiff was more qualified than Bishop overall for the position.  Moreover, although Plaintiff claims that her "desire to improve" is evidenced by her attendance at the New Horizon Learning Center to study Access and take a time management class, she admits that her attendance

---

[31] *Van T. Junkins & Assoc., Inc.*, 736 F.2d at 657.

occurred in October 2004, over a year *after* the Accounting Supervisor position was filled in May 2003. (Hall Declaration, at 3). Plaintiff has not shown that Sterne's assessment of her enthusiasm and desire for self-improvement was pretextual.

In this case, Defendant has articulated specific reasons why it believed Bishop to be more qualified for the position than Plaintiff. It is well-settled that Plaintiff's personal opinion of her qualifications does not create a genuine issue of material fact as to whether Defendant honestly believed that she was less qualified than the successful candidates. *Holifield*, 115 F. 3d at 1565 (reiterating that the opinion of the decision-maker, not the employee's own perception of his own abilities, is what matters in an intentional discrimination case). The salient question is whether the Defendant's reasons, even if incorrect, were the real reason for his non-selection, or rather, a pretext for race discrimination. There is no evidence to suggest that Defendant's articulated reasons were not the real reasons why Bishop (not Plaintiff) was promoted. Moreover, there is nothing in this record that even hints of race discrimination.[32]

Moreover, the Eleventh Circuit mandates that defendants are to be afforded great discretion in the selection of management-level employees because such positions require responsibilities not

---

[32] It does not appear that even Plaintiff really believes race was a motivating factor in the decision to promote Bishop. During her deposition, Plaintiff testified as follows:

Q:    What evidence do you have that--if I understand your lawsuit is--you are saying that you were not given or were not promoted to the accounting supervisor job in May of '03 because of your race, correct? Is that correct?

A:    Well, I--that would be part--I couldn't say because of my race. I couldn't say that he hired her just because she was white and I'm black. I couldn't just pinpoint that because of what they based their decision on. I can't say that.

(Hall's Depo., p. 42, line 20 to p. 44, line 3).

fully measured by objective standards.  *Chapman*, 229 F.3d at1033-34.  Plaintiff has not demonstrated that her qualifications were so superior to Bishop's "that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Lee,* 226 F.3d at 1254.

For these reasons, the court finds that Plaintiff has not adduced sufficient evidence to prove either "that intentional discrimination did indeed motivate the defendant or [] to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons." *Reeves v. Sanderson Plumbing Prods. Inc.*, 120 S. Ct. 2097, 2108-09 (2000).  Accordingly, summary judgment is due to be granted on Plaintiff's promotion claim.

## IV.   Conclusion

For the reasons stated above, Defendant's motion for summary judgment is due to be granted. The court finds that no genuine issues of material fact remain for trial as to Plaintiff's claims and that Defendant is entitled to judgment as a matter of law.  Defendant's Motion to Strike will be denied. A separate Final Judgment will be entered.

**DONE** and **ORDERED** this _____1st_____ day of August, 2005.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

21